OPINION OF THE COURT
Toko Serita, J.
Defendant moves to vacate her plea of guilty to disorderly conduct (Penal Law § 240.20) under docket number 2000QN056893 and the judgment of conviction and sentence rendered on November 14, 2000, and her plea of guilty to criminal possession of a weapon in the fourth degree (Penal Law § 265.01) under docket number 2003QN050066 and the judgment of conviction and sentence rendered on November 7, 2003, pursuant to Criminal Procedure Law § 440.10 (1) (h) and (i).
The Parties’ Contentions
Defendant asserts that her prior convictions are directly related to her arrests for prostitution offenses, and that because she is a victim of human trafficking, those convictions must be vacated and the cases dismissed. Defendant also argues that she was denied effective assistance of counsel when she pleaded guilty in each case.
The People do not contest the factual allegations presented by defendant. Rather, they argue that her second conviction for criminal possession of a weapon should not be vacated because it is not a prostitution-related charge, and as a matter of public policy, CPL 440.10 should not grant greater protection to human trafficking victims in weapons cases. They also assert that defendant failed to seek relief under CPL 440.10 with due dili *430 gence because she filed her motion three years after she ceased to fear her trafficker in 2008, and a year after CPL 440.10 was amended in 2010 to allow relief for human trafficking victims (see CPL 440.10 [1] [i]).
Procedural History
Defendant L.G.[1] was arraigned on November 14, 2000 under docket number 2000QN056893 under an alias[2] and charged with prostitution (Penal Law § 230.00). Defendant pleaded guilty on that date to disorderly conduct (Penal Law § 240.20) and was sentenced to a conditional discharge.
Subsequently, on November 7, 2003 defendant was arraigned under docket number 2003QN050066, again, under an alias and charged with loitering for the purpose of engaging in a prostitution offense (Penal Law § 240.37 [3]), criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [1]) and disorderly conduct (Penal Law § 240.20 [5]). On November 7, 2003 defendant pleaded guilty to criminal possession of a weapon in the fourth degree and was sentenced to three years of probation. Thereafter, on May 5, 2004, defendant was declared delinquent for violating the conditions of her probation. On November 28, 2006 defendant was convicted of violation of probation and sentenced to 10 days’ imprisonment.
I. Factual Background
The People do not contest defendant’s factual averments. Accordingly, the court accepts as true the following facts set out in defendant’s moving papers:
Defendant, “L.G.,” was forced into prostitution when she was only 12 years old. She was born in 1986 in Brooklyn, New York, and lived with her grandmother until she was eight years old. While living with her grandmother, L.G. was sexually abused by an uncle, but she never received any medical attention even though the Administration for Children’s Services was involved and informed about the abuse. Following her grandmother’s death, L.G. was placed into foster care and over the next few years, she was bounced around different foster homes until she was 12 years old, when something happened that changed her life.
*431 There was a strip club across the street from where she lived with a foster family in Brownsville, Brooklyn. One day she was approached by a man in this thirties, “A.”[8] He took her to a house where six other underage girls were living. Each of these girls had a bed in a different room, and “A,” who was very nice to her at first, told her that if she stayed with him, she would not have to go back to her foster family. He kept her there and would not permit her to return to her foster home. He explained the rules of the “game”[3]
[4] to her, and although she didn’t understand it at the time, “A” was preparing her to become a prostitute.
After several weeks, “A” sent her out to a “track”[5] on Pennsylvania Avenue in Brooklyn, accompanied by the other girls, who were there to make sure she did not get snatched by other pimps. Thereafter, he took her to that track repeatedly so that she could earn money for him through prostitution. L.G. was scared to leave “A” because he severely beat the other girls just for speaking with other men. He also beat them with hangers because he thought they were a bad influence on defendant. Later, at the encouragement of some girls she met on the track, defendant started working for another pimp, named “B,” in Crown Heights, because she felt safer with him. Although he was also nice to her on the first day they were together, the next day he forced her to go out and make money for him through commercial sex. “B” also intimidated her with physical violence and was very strict with his girls, whom he forced to work daily from 7:00 p.m. to 8:00 a.m.
When L.G. was about 13 years old, she started working for “C.” She was required to give him the money she made in exchange for her own room. She did not enjoy her life being prostituted: “It wasn’t like I wanted to be out there, but being in foster care, going from home to home, I felt like nobody cared about me. It made me feel so miserable.”
*432 After about six months, L.G. met another pimp called “D” who took her to Atlantic City, New Jersey. In 2000, “D” sent her by bus to Washington, D.C., and then to Miami, Florida. In Florida, defendant, who was 14 years old at the time, attempted to leave “the life”[6] by calling her brother’s father who lived in Ft. Lauderdale. He came to get her, and she lived with him and her brother for about two weeks. A friend bought her a ticket back to New York, where she resumed foster care placement. However, the family she was placed with did not support her.
She then met a girl who introduced her to a manipulative pimp called “E” in Coney Island. L.G. was 14 years old at the time and he was about 30. He was very violent and would severely beat the girls who worked for him, including L.G., who was afraid that he would kill her if she ever tried to leave him. She recalled that “some girls left once they realized he was so scary, but ‘E’ would find them and beat them up. If a girl made a lot of money, he would put fear in her heart not to leave.” He beat the defendant often, sometimes violently, for not making enough money or for threatening to leave, and would use a belt, or an iron, or any other handy object. Once he beat her so badly about the face that she was unable to leave the house for two weeks, primarily because “E” was afraid she might attract the attention of the police. He also forced her, as well as all his other girls, to have sex regularly with him. During the time she was with him she worked the tracks in Brooklyn, Queens, the Bronx, New Jersey, and other states. “E” instructed L.G. to use a false name and age if she was ever arrested. She was with “E” for about 372 years.
Defendant was first arrested in Queens County for prostitution on November 14, 2000 when she was 14 years old. In accordance with her pimp’s instructions, she provided a false name and birth date to the police to appear older. Defendant was next arrested on November 2, 2003 for loitering for purposes of prostitution, disorderly conduct, and criminal possession of a weapon in the fourth degree for allegedly carrying a knife. She was 17 years old at the time. L.G. admits that she carried a small pocketknife “no bigger than [her] forefingers,” which had been given to her by her pimp, who instructed her to carry it *433 with her for protection when she was on the street. “Johns”[7] had raped, assaulted and threatened L.G. with weapons many times while she was forced to work as a prostitute. Defendant explained that
“[a]t the time of my second arrest, I had heard that there was a guy out there who pretended to be a client, but would then rape girls and beat them up. It felt like every time I turned around, some girl was missing. Another girl I knew was raped and beaten up by a trick. She ended up in the hospital. I had already been raped by clients and was terrified of it happening again. Every time I went out I was scared of being raped or killed.”
The night she was arrested, L.G. was working in a dark and very scary area near a bus stop when she was stopped by a police officer, who requested her identification, inspected her purse and discovered the pocketknife. L.G. thought that she was being arrested for prostitution, not for possession of a weapon. In any event, she pleaded guilty to the weapons charge and was sentenced to probation for three years, which she eventually violated. According to her, she only discovered years later that there was a warrant for her arrest when she applied for a certificate of disposition so that she could get a job as a home health aide. Because she had failed to comply with probation, she was sentenced to 10 days’ incarceration on November 28, 2006.
In 2004, L.G. was 18 years old when she was finally able to leave “the life.” Her pimp, “E,” had been arrested, which gave her a chance to escape. She returned to a foster care placement agency, and for the first time in her life, disclosed what had happened to her as a child. They placed her with a family on Staten Island to keep her away from Brooklyn, where she did not feel safe because she had been informed that her pimp was looking for her. She went back to school and stayed with her foster family in Staten Island for a year before she was able to get a subsidized apartment right before her 21st birthday.
*434 L.G. had been previously mandated by the family court to participate in the GEMS program[8] back in 2001 when she was 14 years old. As a result, she received support and counseling from them. After leaving prostitution in 2004 she reconnected with GEMS and became an active member, participating in their educational initiative program and in various therapy groups before starting school again. She received a home health aide degree in February 2007 and was working in that capacity during most of 2007, until the New York City Department of Health ran a background check and informed her that she could no longer work because of her past convictions. She received her GED in 2010 and subsequently qualified for a certificate as a medical assistant. More recently, L.G. was questioned about her ability to be a fit guardian when she petitioned for custody of her nephew — because of her convictions.
In 2008, defendant received a message from her pimp in which he stated that he was not coming after her. However, she still feared him and therefore did not report him as her trafficker. In her affidavit in support of her motion, she stated that
“[o]ne of my family members was recently murdered by her pimp. He beat her to death. Even though it’s been many years since I was trafficked, hearing about this was so emotionally difficult. It touches me every day. I remember how fearful I felt when I left. I was always afraid that ‘E’ was going to come and hurt me. It’s only recently that I just got that fear out of my heart.”
Defendant is currently a student at Medgar Evers College, and expects to graduate in 2014 with a Bachelor’s degree in public administration and social work. She avers that she wants “to vacate my convictions so that I can move forward with my life and career without being held back by my past.”
II. Analysis
Defendant L.G.’s odyssey as a victim of human trafficking began when she was only 12 years old; she was picked up off the streets of New York City and forced into prostitution for the next several years by a succession of exploitative men who already had other underage girls working for them. Having endured physical and sexual violence at the hands of her pimps, *435 Johns, and family members, defendant’s childhood and adolescence were marked by rapes, sexual assaults, kidnapping, enslavement, and threats of death. Before she was 18 years old, L.G. had been arrested twice for prostitution-related offenses in Queens, resulting in a conviction for disorderly conduct when she was 14 years old after the first arrest, and another for criminal possession of a weapon three years later, when she was 17 years old. In both instances, however, she was charged and convicted as an adult in local criminal court.
As noted earlier, the facts are undisputed in this case. At issue here is whether Criminal Procedure Law § 440.10 (1) (i) empowers the court to dismiss non-prostitution convictions which directly resulted from defendant’s victimization as a trafficked person or whether the statute’s scope must be narrowly applied to vacate only convictions for prostitution-related offenses.
Amendment of CPL 440.10 Vacatur Statute
In 2010, New York became the first state in the country to pass a law which allows defendants to vacate their prior convictions which resulted from their experiences as victims of human trafficking (CPL 440.10 [1] [i]).[9] It did so by amending CPL 440.10 to create a new form of post-conviction relief which affords victims of sex trafficking the remedy of vacating their convictions if they can establish that
“[t]he judgment is a conviction where the arresting charge was under section 240.37 (loitering for the purpose of engaging in a prostitution offense . . . ) or 230.00 (prostitution) of the penal law, and the defendant’s participation in the offense was a result of having been a victim of sex trafficking under section 230.34 of the penal law [New York’s sex trafficking statute], or trafficking in persons under the [Federal] Trafficking Victims Protection Act (United States Code, title 22, chapter 78)” (id.).[10]
Thus, in order to obtain the requested relief, the movant must *436 establish that (1) she was a trafficking victim at the time of her arrest, and (2) her conduct or “participation in the offense” leading to her arrest resulted from her being trafficked. Although New York, unlike federal law, does not have a definition of what constitutes a sex trafficking victim, it necessarily follows that any person who is a victim of the statutory crime of sex trafficking would meet this definition. A person is guilty of sex trafficking under Penal Law § 230.34 if he or she “intentionally advances or profits from prostitution” by engaging in any one of several types of conduct, such as taking or keeping an individual’s passport or immigration documents to induce a victim to become involved in or to remain in prostitution (Penal Law § 230.34 [3]), or by using different methods of force or coercion to instill a fear in the trafficked victim to compel her to engage in or continue to engage in prostitution (Penal Law § 230.34 [5] [a]-[h]).
On the federal level, the Trafficking Victims Protection Act specifically mentioned in CPL 440.10 (1) (i) defines “severe forms of trafficking in persons” to include sex trafficking either in which the victim is induced to engage in a commercial sex act through force, fraud or coercion, or where the victim induced to engage in a commercial sex act has not attained the age of 18 (22 USC § 7102 [9] [A]). Severe forms of trafficking in persons also include “the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery” {id. at § 7102 [9] [B]).
This court finds that L.G. was clearly a victim of sex trafficking under both federal and New York state standards. L.G. has demonstrated that she was clearly a victim of sex trafficking under the relevant state sex trafficking statute because of her traffickers’ use of force and fear to compel her participation in prostitution (Penal Law § 230.34 [5]). Defendant also meets *437 the requirements under the federal TVPA as a victim of a “severe” form of trafficking because she was induced into commercial sex while under 18 years of age (22 USC § 7102 [9] [A]; People v G.M., 32 Misc 3d 274, 280 [Grim Ct, Queens County 2011]; see also People v Doe, 34 Misc 3d 237 [Sup Ct, Bronx County 2011]).[11]
More to the point, L.G.’s participation in the offences which led to her two convictions was the direct result of her actions as a trafficking victim forced into street prostitution by her pimp/ trafficker. The People do not contest either defendant’s status or the circumstances surrounding both of her arrests; only that her second conviction should not be subject to vacatur under this statute. Thus, the only disputed issue in this case is whether defendant’s conviction for a non-prostitution offense which was the direct result of her having been forced into sex trafficking may be vacated under CPL 440.10 (1) (i). L.G. argues that while her second conviction for weapons possession is admittedly not a prostitution offense, it should nevertheless be dismissed because it resulted from her forced involvement in trafficking activity by her pimp when he required her to engage in street prostitution. To support the connection between the weapons conviction and defendant’s coerced prostitution activities, defense counsel notes that L.G. possessed a pocketknife to protect herself against unpredictable and potentially violent situations involving “Johns,” and was told to do so by her trafficker.
For the reasons explained below, this court holds that L.G.’s conviction for possession of a weapon in the fourth degree falls within the ambit of the vacatur statute because her participation in that offense was undeniably connected to the coerced trafficking activity which led to her arrest on prostitution-related charges and should therefore be vacated.
Vacatur Not Limited to the Arresting Charge under CPL 440.10 (1) (i)
The New York legislature passed the new vacatur law, codified at CPL 440.10 (1) (i), based upon a recognition of the continuing harm done to trafficking victims who are burdened with criminal convictions as a result of their victimization in *438 the commercial sex trade. While New York recognized “the severity of the crime of sex trafficking” by passing the sex trafficking statute in 2007 (Penal Law § 230.34),[12] one of the sponsors of this new vacatur statute acknowledged that “gaps remain in our ability to provide justice to the victims” (Sponsor’s Letter in Support, July 20, 2010, Bill Jacket, L 2010, ch 332 at 10).
“Victims of trafficking into commercial sex are frequently arrested for prostitution-related offenses and are then saddled with the criminal record for life, long after they may be freed from exploitation. [This] record may prevent them from obtaining gainful employment and impair their ability to access or stay in public or private housing, advance their education, or participate in other important aspects of life. Trafficked persons should not suffer ongoing punishment for acts they committed unwillingly under coercion” (id.).
This new legislation was thus intended to “give victims of human trafficking a desperately needed second chance they deserve” (Sponsor’s Mem in Support, Bill Jacket, L 2010, ch 332 at 13; see People v G.M., 32 Misc 3d at 279; People v Doe, 34 Misc 3d at 237 [new legislation designed to assist minor trafficking victims]).
Central to the issue raised by the instant motion is determining what is meant by the term “arresting charge” in CPL 440.10 (1) (i), and whether eligibility for relief is confined only to prostitution and loitering offenses. The statutory language of subdivision (1) (i) specifies that the court may grant vacatur if “[t]he judgment is a conviction where the arresting charge was under” either of the offenses for loitering for the purpose of engaging in a prostitution offense (Penal Law § 240.37), or prostitution (Penal Law § 230.00) (CPL 440.10 [1] [i]).
Indeed, human trafficking victims are frequently arrested and charged for a variety of offenses based on actions which the victims were unwillingly coerced into committing by their traffickers. Any interpretation of CPL 440 (1) (i) that would narrow the definition of “arresting charge” to include only prostitution offenses as being entitled to post-conviction relief would *439 certainly neither address the coercive forces confronting trafficking victims nor comport with the ameliorative legislative purposes of providing “relief and justice ... to sex trafficking victims” (Governor’s Approval Mem, Bill Jacket, L 2010, ch 332 at 6). Rather, this new law is premised upon the profound understanding that “trafficked persons should not suffer ongoing punishment for acts they committed unwillingly under coercion [of a trafficker]” (Sponsor’s Letter in Support, July 20, 2010, Bill Jacket, L 2010, ch 332 at 10), in which they are “presumably not criminally liable for the offense” (Peter Preiser, 2010 Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 440.10, 2013 Pocket Part at 99).
The insertion of the term “arresting charge” in CPL 440 (1) (i) was deliberate on the part of the legislature. As the bill’s sponsors observed, “[t]he bill is keyed to the ‘arresting charge’ because it is common for a person arrested on prostitution-related charges to plead guilty to some other lower-level offense such as disorderly conduct; the bill’s remedy should be available to such a person” (Sponsor’s Letter to Governor’s Counsel, Aug. 11, 2010, Bill Jacket, L 2010, ch 332 at 11). Similarly, the Governor’s approval memorandum recognized that a defendant could be arrested for prostitution but convicted of another offense, and seek vacatur of that conviction under the statute (Governor’s Approval Mem, Bill Jacket, L 2010, ch 332 at 6). Thus, the legislative history of CPL 440.10 (1) (i) shows that the legislature anticipated that a victim of human trafficking arrested on prostitution-related charges may ultimately plead guilty to an alternate count. It necessarily follows that where, as here, one of the arresting charges was loitering for the purpose of engaging in prostitution, and the defendant pleaded guilty to a related non-prostitution crime, then that conviction must be regarded as having resulted from defendant’s having been a victim of sex trafficking. Consequently, that charge may be vacated under CPL 440.10 (1) (i).
In the instant case, L.G.’s second arrest charged her with a variety of crimes other than simply loitering for the purpose of engaging in prostitution. Affording her the remedy of vacatur for those offenses which were also committed under force and coercion by an underage victim of sex trafficking is consistent with the legislature’s intent. There is no dispute that she was clearly a minor victim at the time of her arrest, under the coercive control of her trafficker, and that she possessed a pocketknife to protect herself on the streets where she was *440 forced to work under dangerous conditions because she had been raped and kidnapped in the past. Her conviction for criminal weapons possession was clearly the result of her having been trafficked and therefore the arrest charge could be considered a prostitution-related offense.
Judicial Discretion Limits Vacatur to Trafficking Related Offenses
Another significant feature of this new law is that the amended statute contemplates the exercise of judicial discretion because it states that the court “may” vacate the judgment of conviction if certain criteria are met. As the Governor’s approval memorandum notes, this also includes the discretion to limit the over-inclusive application of the statute to avoid vacating convictions for more serious crimes. “By allowing a court to deny a motion, even though the defendant committed a crime as a result of his or her victimization, the bill properly permits judicial consideration of the nature or seriousness of the crime” (Governor’s Approval Mem, Bill Jacket, L 2010, ch 332 at 6). Thus, the statute grants to the court discretion to consider non-prostitution crimes for vacatur, but in exercising that discretion, the court must ensure that serious crimes are not vacated merely because the defendant happened to be a victim of trafficking. Additionally, under subdivision (6) of CPL 440.10, the statute specifically contemplates the use of judicial discretion to “take such additional action as is appropriate in the circumstances.”[13]
Previously, this court, in People v G.M. (32 Misc 3d 274 [2011]), vacated a trafficking victim’s convictions for two violations stemming from drug charges (disorderly conduct [Penal Law § 240.20]), and four B misdemeanor convictions, two for criminal trespass in the third degree (Penal Law § 140.10), and two for prostitution (Penal Law § 230.00).[14] In that case, the People consented to the dismissal of all six of the defendant’s convictions, including those that did not involve prostitution charges, because they agreed that the defendant was clearly a *441 victim of sex trafficking during each of her arrests.[15] In carefully reviewing the specific facts of this case, the court finds no difference between defendant’s status as a victim of sex trafficking and that of the defendant G.M. Accordingly, there is no discernible distinction between both cases except for the fact that L.G. pleaded guilty to the crime of fourth-degree criminal possession of a weapon, an A misdemeanor.
In People v G.M., this court left open the question whether CPL 440.10 (1) (i) could be applied to non-prostitution offenses where the People have not consented to vacatur of the resulting conviction(s). It is now evident from the foregoing analysis of the legislative history behind the statute, that the legislature’s goal in amending the statute was to avoid punishing the victims of human trafficking by saddling them with a criminal record. It is also apparent that the legislature fully expected the statute to provide relief to trafficking victims who were not only arrested for prostitution or loitering for the purpose of prostitution, but were also convicted of other charges. Finally, the legislature noted that discretion remains with the court to determine which convictions should be vacated.
Additionally, this court rejects the People’s argument that defendant failed to file this motion with due diligence after she ceased to be a victim of sex trafficking, as required under CPL 440.10 (1) (i). According to defendant’s uncontested factual averments, she escaped her trafficker in 2004, but feared until 2008 that he would track her down and harm her. The statutory provision under which defendant now seeks relief was not enacted until August 2010 and defendant filed her motion in September 2011. Considering the significant amount of effort required to prepare the instant motion, and the fact that CPL 440.10 (1) (i) had only been in effect for barely one year when defendant filed her motion, this court finds that defendant made her motion with necessary due diligence as required under CPL 440.10 (1) (i) (i).
*442 Accordingly, in order for the court to exercise its discretion to consider vacatur of each of defendant’s judgments of conviction, the court must examine the unique factual circumstances pertaining to each conviction.
Motion to Vacate Judgment under Docket Number 2000QN056893
Defendant was arraigned on November 14, 2000 under docket number 2000QN056893 and charged with prostitution (Penal Law § 230.00). Defendant pleaded guilty on that date to disorderly conduct (Penal Law § 240.20) and was sentenced to a conditional discharge. This conviction precisely fits the pattern anticipated under CPL 440.10 (1) (i) for permitting the judgment to be vacated.
Additionally, the court notes that based upon L.G.’s uncontroverted factual averments, she was only 14 years old at the time of her conviction for disorderly conduct. Because disorderly conduct is an offense for which criminal responsibility is not imposed on a minor under age 16 (Penal Law § 30.00 [2]), the conviction on that charge is a nullity and should be dismissed (Penal Law § 30.00 [1]; People v Lebron, 197 AD2d 416 [1st Dept 1993], lv denied 82 NY2d 898 [1993]; People v McFadden, 194 AD2d 566 [2d Dept 1993], lv denied 82 NY2d 722 [1993]).
Accordingly, the judgment convicting defendant of disorderly conduct was ordered vacated, and the accusatory instrument dismissed by this court.
Motion to Vacate Judgment under Docket Number 2003QN050066
On November 7, 2003 defendant was arraigned under docket number 2003QN050066 and charged with loitering for the purpose of engaging in a prostitution offense (Penal Law § 240.37 [3]), criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [1]) and disorderly conduct (Penal Law § 240.20 [5]). Defendant pleaded guilty to criminal possession of a weapon in the fourth degree and received a sentence of three years’ probation. It is apparent both from defendant’s factual averments, and the factual allegations contained in the complaint filed in the case, that the knife at issue which gave rise to the weapons possession charge, was recovered incident to defendant’s prostitution-related activity, and that she was a victim of trafficking at the time of her arrest. Accordingly, the judgment convicting defendant of criminal possession of a *443 weapon in the fourth degree was ordered vacated and the accusatory instrument dismissed by this court.
Conclusion
Based upon the foregoing, this court vacated the judgments of conviction entered under docket number 2000QN056893 and docket number 2003QN050066 pursuant to CPL 440.10 (1) (i) and dismissed the accusatory instruments in each of these cases by order dated January 2, 2013. The court further ordered that the records of defendant’s convictions be sealed under CPL 160.50 (1) and (3) (f).

. The decision has been edited for publication. Defendant’s true name is withheld because the records of conviction were vacated by this court and are sealed under CPL 160.50 (1) and (3) (f).

. The aliases which defendant used at the time of arrest have been redacted for publication at defense counsel’s request.

. At the request of defense counsel, the street names of defendant’s traffickers have been denoted with consecutive letters in order to safeguard L.G.’s identity.

. “Pimps call themselves ‘players’ and their profession ‘the game’ ” (Celia Williamson & Terry Cluse-Tolar, Pimp-Controlled, Prostitution: Still an Integral Part of Street Life, 8 Violence Against Women 1074, 1078 [Sept. 2002]).

. The “track” refers to a public location where prostitutes are forced by their traffickers to present themselves to prospective consumers (see Shoshana Walter, Fighting Prostitution One Motel at a Time, NY Times, Dec. 9, 2010, § A at 25A, available at http://www.nytimes.com/2010/12/10/us/ 10bclodge.html).

. Another slang term for prostitution (Williamson & Cluse-Tolar, supra n 4 at 1074).

. “Johns,” i.e., a slang term for buyers of commercial sex (see Marihug Cedeño, Pimps, Johns, and Juvenile Prostitutes: Is New York Doing Enough to Combat the Commercial Sexual Exploitation of Children?, 22 Cornell JL & Pub Pol’y 153, 161 [Fall 2012]; see also Penal Law § 230.02).

. GEMS: Girls Educational and Mentoring Services is an organization that provides services for young women and girls who have been victims of commercial sexual exploitation, domestic trafficking, and violence.

. Urban Justice Center, Press Release: Governor Paterson Signs First in the Nation Bill Allowing Survivors of Sex Trafficking to Clear Prostitution Convictions (Aug. 16, 2010), available at http://www.sexworkersproject.org/ press/releases/swp-press-release-20100816.html.

. The Trafficking Victims Protection Act (TVPA) of 2000 was subsequently reauthorized by the Trafficking Victims Protection Reauthorization Act of 2003 (Pub L 108-193, 117 US Stat 2875), the Trafficking Victims Protection Reauthorization Act of 2005 (Pub L 109-164, 119 US Stat 3558), the Wil *436 liam Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Pub L 110-457, 122 US Stat 5044), and the Violence Against Women Reauthorization Act of 2013 (Pub L 113-4, 127 US Stat 54); see generally Pamela Chen & Monica Ryan, Federal Prosecution of Human Traffickers, Lawyer’s Manual on Human Trafficking: Pursuing Justice for Victims 271, 271 (Jill Laurie Goodman & Dorchen A. Leidholdt 2011) (“With each reauthorization and amendment of the TVPA in legislation known as the Trafficking Victims Protection Reauthorization Act [TVPRA], Congress has strengthened and fine-tuned its provisions, as well as extended the reach of its criminal statutes”).

. One of the noticeable differences between the state and federal laws is that force, fraud or coercion need not be established under federal law to find anyone under 18 years of age to be a victim of a “severe” form of trafficking if they have been induced to perform commercial sex.

. New York did so alongside the passage of the labor trafficking statute (Penal Law § 135.35), which created a D felony offense for the crime of exploiting someone’s labor through a number of specified means similar to the statutory framework of sex trafficking.

. “If the court grants a motion under paragraph (i) of subdivision one of this section, it must vacate the judgment and dismiss the accusatory instrument, and may take such additional action as is appropriate in the circumstances.” (CPL 440.10 [6].)

. The charges for which defendant G.M. was convicted were omitted from the reported decision. However, they were included in this court’s original filed decision.

. In the few reported cases which have so far granted relief under CPL 440.10 (1) (i), trial courts have vacated human trafficking victim’s convictions for loitering for the purpose of prostitution (Penal Law § 240.37) and prostitution (Penal Law § 230.00) (see People v Doe, 34 Misc 3d at 237 [vacating convictions for Penal Law § 240.37 and Penal Law § 230.00]); as well as for non-prostitution offenses (see People v G.M., 32 Misc 3d 274 [2011]; but see People v Gonzalez, 32 Misc 3d 831, 835 [Crim Ct, NY County 2011] [while court vacated 86 convictions for prostitution or loitering, it nevertheless declined to vacate a conviction for resisting arrest (Penal Law § 205.30), finding that the underlying offense in that case was not a prostitution-related offense]).